STATE OF MAINE                                        SUPERIOR COURT
CUMBERLAND, ss.                                       CIVIL ACTION
                                                      Docket No. RE-06-241

JOHN R. POST, et al.,

            Plaintiffs,              RECEIVED

      v.                                                    ORDER

RICHARD S. GALE, et al.,

            Defendants.


      A non-jury trial was held in the above captioned case on November 13-15, 2007.

Thereafter the parties requested the right to file post-trial briefs and, after several

extensions, those briefs were filed on January 10, 2008. The court prepared its findings

of fact shortly after the trial, after reviewing the depositions submitted by the parties,

but has delayed issuing those findings until it has had time to review the briefs filed by

the parties and the authorities cited.

      This case involves defendants' erection of a fence – alleged by plaintiffs to be a

"spite fence" – along a portion of the property line between plaintiffs' property and

defendants' property on Little Sebago Lake. At the time of trial and in several of their

post-trial submissions the parties have withdrawn several of the causes of action set

forth in their pleadings. Specifically, plaintiffs withdrew Count II of their amended

complaint (statutory private nuisance).[1] At trial defendants withdrew their trespass

claim with respect to the location of plaintiffs' septic system and subsequently

withdrew Counts I and II of their counterclaim in their entirety.[2]

---

[1] See Plaintiffs' Post-Trial Brief dated January 9, 2008 at 1 n.1. Plaintiff's claim under the spite
fence statute, 17 M.R.S. § 2801, is set forth in Count I of their complaint and remains to be
adjudicated.
[2] See, e.g., Defendants' Post-Trial Brief dated January 9, 2008 at 22.

Remaining for decision, therefore, are the following claims: plaintiffs' claim under the spite fence statute (Count I of amended complaint); plaintiffs' common law nuisance claim (Count III); plaintiffs' claims for equitable relief, abatement, and declaratory relief (Counts IV-VI); plaintiffs' claims based on preemptive easement, acquiescence, and estoppel (Counts VII-IX); and defendants' statutory trespass claim based on the alleged removal by Gail Post of a temporary fence and sign from defendants' land.

Based on the evidence at trial the court makes the following findings of fact:

1. Plaintiffs John and Gail Post and defendants Richard and Deanna Gale both own adjoining waterfront properties located on Waterview Road on Little Sebago Lake in the Town of Gray, Maine, sharing a boundary that extends from Waterview Road down to the lake.

2. The use of the property by the Gales is seasonal, from approximately May 15 through September 15 each year.

3. The Gales purchased their property in 1975. The Posts purchased their property in 1992.

4. When the Posts purchased their property, the only structures on their property were an old cottage and outbuilding. The Gales' house is located well away from the common boundary line but the Gales have a detached garage which at its closest point is located approximately 10 feet away from the boundary line. *See* Plaintiffs' Exs. 5 and 15. Other than this garage, no fence or other structure existed along the common boundary of the two properties until after Memorial Day, 2006.

2

5. In late 2004, the Posts applied for and obtained building, shoreland zoning, and other permits to raze the existing structures and build a single-family residential home on their property.

6. The Gales did not object to the issuance of these permits.

7. The Posts, who at that time had a very friendly relationship with the Gales, went to the Gales and discussed their proposed new residence with the Gales, showing them plans and informing them of the nature of the project. At that time they solicited any input or suggestions the Gales might offer.

8. Having reviewed the plans and sketches shown to them by the Posts, the Gales were fully aware that the design of the new home proposed by the Posts was oriented to obtain the maximum amount of sunlight and take advantage of southwesterly views of the lake across a corner of the Gales' property.

9. A plan of the original dwelling and other structures on the Posts' property was admitted in evidence as Plaintiffs' Exhibit 14.

10. A plan of the new residence constructed by the Posts was admitted in evidence as Plaintiffs' Exhibit 15.

11. The Posts' property is considerably narrower than the Gales' property. The Post lot is approximately 90 feet wide on Waterview Road, while the Gales' lot is approximately 250 feet wide on Waterview Road. Plaintiffs' Exhibit 5. Because of the width of the properties and because the Gales' residence is located on the southern side of their property away from the Posts' boundary, *see id.*, both the original residence on the Post property and the new residence constructed by the Posts in 2004-05 are far closer to the common boundary line than the Gales' residence.

3

12. Solicited for the views on the design and orientation of the Posts' new residence, the Gales conveyed only encouragement and never raised any objection to the design or its orientation to take advantage of water views over a corner of their property. Indeed, Richard Gale expressly encouraged the Posts to maximize the amount of glass on side of the proposed house facing southwesterly over a corner of his property, telling them it would be to their advantage to "bring the outside in."

13. The Posts relied upon the Gales' encouragement and their lack of objections in adhering to the proposed design and specifically accepted Richard Gales' recommendation to choose the window design with the maximum amount of glass along the southwestern side of their new residence.

14. The Posts relied to their detriment upon the Gales' response to the design and orientation of their proposed new residence. If the Posts had been advised that the Gales objected (for whatever reason) to their design, they would have reconsidered their plans. Had they known that the Gales had supposed privacy concerns or of the possibility that the Gales would build a fence, the Posts testified they would have redesigned the house to maximize their water views to the west and northwest. The court found this testimony to be credible.

15. The only concern expressed by the Gales to the Posts before construction began in the late summer of 2004 involved a tree which the Posts were planning to remove along the northern side of their driveway. The tree was on the side of the driveway away from the Gales' property but Richard Gale expressed the view that the tree should not be removed. The Posts, at their expense, consulted an arborist recommended by the Gales, and the arborist agreed that the tree should come down.

4

16. Subsequently, after the Posts left for the winter and site work was underway, Dick or Deanna Gale called the code enforcement officer to complain about the removal of other trees. Work stopped briefly until the code enforcement officer visited the site, determined the complaints were unfounded, and allowed work to proceed. The Gales did not speak to the Posts on this issue.

17. The foundation was laid in October 2004 at which time the orientation of the house was set. Construction thereafter proceeded and by June 2005 the Posts were ready to move in. When they got to Maine on or about June 25, 2005 they learned that Richard Gale was vigorously objecting to an aspect of the Posts' new driveway which he thought would result in diverting water onto the Gales' property. No water had in fact been diverted, and it is doubtful that Gale's fears were warranted. After initially agreeing that he would not call the town until the Posts and their contractor had a chance to study the situation, Gale complained to the town anyway. To satisfy Gale's concerns, even though they appeared to have been unfounded, the Posts thereafter re-routed a drainage channel at the bottom of their driveway at a cost of approximately $1,775.

18. At or shortly after the time the drainage issue arose, Richard Gale raised several additional issues. He complained about a silt fence that had been erected by the contractor the previous fall near the boundary line. Although the silt fence had long since been taken down and Gale had not complained at the time, he now complained that it had been on his side of the boundary. He also complained about a small amount of gravel that he said had ended up on his side of the boundary, about the alleged placement of logs from a dead tree on his property, and about some other wood that had been temporarily placed on the property. In every instance, the issues had been resolved long ago, often immediately after

5

the Gales called the issue to the attention of the contractor. Richard Gale also complained that during the winter, a swimming float used by the Posts was being pulled up on the Gales' side of the boundary, although Richard Gale had previously given the Posts permission to do so. The Posts moved the float.

19. At no time during this period did the Gales express any privacy concerns to the Posts, nor did they ever approach the Posts to discuss the placement of any fence along the common boundary. They also did not approach the Posts to discuss whether any plantings or shrubbery could be placed to screen the boundary.

20. Shortly before Memorial Day weekend 2006, without any warning to the Posts, the Gales erected a five-foot high plastic fluorescent "snow fence" stretching along the common boundary from the road to the water and posted a large sign stating "Please, No Dumping, Thank You" facing the Posts' house on a tree where the boundary line was closest to the house.

21. The snow season was long since over. The "No Dumping" sign exceeded two square feet and extended higher than eight feet above the ground at its highest point. *See* Plaintiffs' Exhibit 2A.

22. Because the Posts' house is oriented to face the southwest and because the orange fence and the large sign were placed along the boundary directly in front of the southwest facing windows of the Post residence,[3] they were extremely obtrusive.

23. Gail Post removed the plastic fence, not knowing who had constructed it or what it was for.

---

[3] The closest point of the Posts' residence to the boundary appears to be approximately 18 feet and the large "No Dumping" sign was placed on the boundary at approximately that point.

6

24. The Gales, without first notifying the Posts, then filed a complaint for theft with the Cumberland County Sheriff's Office. Upon investigation by the Sheriff, no charges were issued.

25. Upon their request, the plastic fence was returned to the Gales. At that time, Mr. Gale threatened to build another fence, saying that he could build it to any height he wanted. At that time, he was advised by the Sheriff's deputy that such a fence would be considered a spite fence.

26. During further discussions, the Gales advised the Posts that the "No Dumping" sign referred to a small amount of gravel that had been pushed over the boundary line the previous winter by the Posts' snow plowing contractor. The Posts removed the gravel and smoothed out the area in question. The Gales replaced the fluorescent temporary fence and the sign.

27. After Memorial Day, the Posts returned to Pennsylvania and did not come back to Maine until just before July 4, 2006, when they arrived to find a solid wood fence approximately 8.5 to 9 feet high running along the boundary from the corner of the Gales' garage to near the lake. The fence was constructed in such a manner that the support posts were placed on the side facing the Posts' property. In front of the fence, on the side of the property facing the Posts, were several cinder blocks from which metal posts extended upward. The cinder blocks and posts were painted fluorescent orange. At various locations along the fence "no trespassing" signed were posted.

28. The next day Gail Post saw Richard Gale filling the cinder blocks in front of the fence with concrete. At that time Gale claimed that the orange blocks with poles were for safety reasons. When Mrs. Post asked him if they could talk like neighbors who both loved coming to the lake, Gale responded that he did not

7

have to talk with her and that "you're just going to have to get your view of the lake from some other location."

29. On or about August 14, 2006, the Posts requested the Gales in writing to remove the fence and advised the Gales that in the Posts' view it constituted an illegal spite fence. Notwithstanding this request, the Gales continued to maintain the fence and all associated structures.

30. The fence as originally constructed, along with the signs and cinderblocks was maintained in place for almost a year. Shortly after the Gales were deposed in late May or early June 2007, they modified the fence by cutting it down to 6 feet and by removing the cinderblocks and the signs.[4]

31. The 8.5 to 9 foot fence, as originally constructed with the posts on the outside and with the accompanying signs and cinderblocks, was extremely obtrusive and offensive. It was designed to block the Posts' view of the lake, to disturb their quiet enjoyment of their property, to annoy them, and to constantly remind them of the Gales' anger and apparent hatred toward them.

32. The justification belatedly advanced by the Gales – that they constructed the fence for privacy reasons – was a pretext offered in an attempt to justify a fence that was constructed solely for malicious reasons. The Gales' testimony with respect to their privacy concerns was not credible, nor for the most part was their testimony on any other subject. The photographic evidence demonstrated that from all the areas where the Gales claimed their privacy was threatened by the Posts' residence (the Gales' deck, their picnic area, and their beach), there were sufficient trees, shrubbery and vegetation to block any view to and from the

---

[4] In a few places, the fence still exceeds 6 feet in height for short stretches.

Posts' house during any portion of the year when leaves are on the trees.[5] To the extent that the Gales could possibly have been concerned about small amounts of snowplowing gravel and water runoff, moreover, the fence is open at the bottom and would do nothing to prevent such problems, which would be minimal in any case.

33. The court does not know whether the Gales became angry at the Posts because the Posts were not apologetic enough about any minor and temporary intrusions that occurred during construction, whether the Gales were angry because new landscaping at the end of the Posts' driveway prevented them from accessing their garage over the Posts' land,[6] or whether (as the court suspects) they were resentful of the Posts for some other reason. The fence was constructed for no other purpose except to annoy the Posts and teach them a lesson.

34. The photographic evidence and the testimony establish that the wooden fence placed by the Gales in June 2006 was intended to be and was in fact extremely conspicuous. Although the fence has since been lowered and some of the more obviously conspicuously malicious features (the orange cinderblocks and signs) have been removed, the fence still is a dominant visual feature on the Posts' property. It can be seen, and dominates the view, from every room in the Posts' house except the laundry room and bathroom. It blocks the view to the southwest of the lake that the house was designed and oriented to obtain. Its purpose remains malicious; it serves no practical purpose other than to block the

---

[5] The Gales are only in Maine after the trees leaf out and before the leaves fall.
[6] Richard Gale made a statement to Bob Skillings that would support this theory. Preventing the Gales from accessing their garage across Post land meant that the Gales would have to drive slightly further down Waterview Road before turning.

9

Posts' view, to interfere with the Posts' use and enjoyment of their property, and to constantly remind them of the enmity borne by their neighbors.

35. The court accepts the Posts' evidence that the loss in the market value of their home as long as the fence remains in place exceeds $100,000.

36. Subsequent to the erection of the fence, the Gales also pursued a complaint that a modification of the Posts' existing septic system would encroach on their boundary. This complaint, which resulted in a brief stop work order, was without basis and was not pursued by the Gales at trial.


Conclusions of Law

1.    Spite Fence Statute

The Posts' first claim is under the Spite Fence Statute, 17 M.R.S. § 2801. Based on the findings above, the court concludes that the fence erected by the Gales in June 2006 was a spite fence which constitutes a private nuisance under 17 M.R.S. § 2801. The fence, even lowered, is still unnecessary and is kept and maintained for the purpose of annoying the Posts. However, there is a serious question as to the available remedy.

While counsel for plaintiff argues "once a spite fence, always a spite fence" and suggests that the court can therefore order it to be abated under the spite fence statute, the court, in reviewing the statutory language, questions whether a fence of less than six feet – even though unnecessary and erected purely for spite – can constitute a spite fence under 17 M.R.S. § 2801.[7]

---

[7] The cases cited by plaintiffs for the proposition that a defendant's removal of a spite fence does not preclude the court from awarding injunctive relief to a plaintiff did not involve statutes defining spite fences as fences exceeding a certain height. *See Racich v. Mastrovich*, 273 N.W. 660 (S.D. 1937); *Dunbar v. O'Brien*, 220 N.W. 278 (Neb. 1928).

10

If the court thought it had the discretion to order the fence removed in its entirety under § 2801, it would without hesitation award that relief. However reprehensible the Gales' conduct, however, the court believes itself constrained to limit any injunctive relief awarded under § 2801 to an order directing the Gales to immediately reduce the remaining portions of the fence that exceed six feet (including any support posts) to no more than six feet in height and prohibiting them from modifying the dimensions of the fence or raising its height in the future. *See Rice v. Moorehouse*, 23 N.E. 229 (Mass. 1890) (spite fence ordered abated to a height of not more than six feet). As discussed below, the court is not similarly constrained in awarding relief to the Posts on their claim of common law nuisance.

With respect to plaintiffs' claim for damages under § 2801, the court agrees with defendants that plaintiffs would only be entitled to damages amounting to lost rental value from the time when the fence was erected in June 2006 until the time of abatement. However, plaintiffs have not offered any evidence of such damages. Once the fence is finally reduced so that no portions exceed six feet in height, the court cannot award damages for the loss in market value under § 2801. *See Caron v. Margolin*, 128 Me. 339, 343, 147 A. 419, 420 (1929). This is true even though the court agrees that – even with a six-foot fence - given the loss of view, the proximity of the fence, and the configuration of the house, the evidence demonstrated a loss in market value exceeding $100,000.

2.    Common Law Nuisance

In *Charlton v. Town of Oxford*, 2001 ME 104 ¶ 36, 774 A.2d 366, 377, the Law Court set out the elements of a cause of action for common law nuisance:    (1) that the defendant acted with the intent of interfering with plaintiff's use and enjoyment of

11

plaintiff's land; (2) that interference with use and enjoyment actually resulted; (3) that the interference is substantial, demonstrating that the land has been reduced in value; and (4) that the interference is unreasonable.

All those elements are met here. Defendants, however, argue with some force that *Charlton* also cited the 1906 case of *Whitmore v. Brown*, 102 Me. 47, 59, 65 A. 516, 521 (1906), and stated that

> *Whitmore* remains good law; the law of the State of Maine does not recognize a cause of action for an "otherwise harmless structure upon the land of another" regardless of how unsightly or overbearing the structure may be.

*Charlton*, 2001 ME 104 ¶ 33, 774 A.2d at 376.

Despite its statement that *Whitmore* remains good law, the *Charlton* court went on to point out that the reason a nuisance claim in *Charlton* was unavailing was that the plaintiffs had not suffered "a quantifiable injury, such that the value of their property has been diminished or that the [defendants'] property had interfered with the use of their property." *Id.* at ¶ 34, 774 A.2d at 376-77. *Charlton* then cited Keaton, *Prosser and Keaton on the Law of Torts* § 88 at 627 (5th ed. 1984) for the proposition that nuisance amounting to mental annoyance cannot amount to unreasonable interference "until it results in a depreciation in the market or rental value of the land." *Id.*

In this case the Posts have proven that there has been depreciation in the market value of their property by reason of the Gale's spite fence even after the latter has been reduced in height.[8] The court acknowledges that there is some inconsistency between the language in *Whitmore* to the effect that aesthetic injury does not infringe any legal rights even if it has an effect on market value, 102 Me. at 57, 65 A. at 520, and *Charlton's* holding that nuisance claims require proof of diminution in value. 2001 ME 104 ¶¶ 34-

---

[8] Moreover, based on the findings above, the Gales' fence is not merely an unsightly and overbearing but "otherwise harmless structure." 2001 ME 104 ¶ 33, 774 A.2d at 376.

35, 774 A.2d at 376-77. Recognizing this inconsistency, the court will follow *Charlton*. It further concludes that in this case, unlike *Charlton*, the Posts have adequately proven special damages. Based on the findings above, therefore, it concludes the Posts have suffered more than a purely aesthetic injury.

Both parties seem to agree that if the Posts are successful on their claim of common law nuisance, the appropriate relief would be for the court to order the fence to be removed. *See* Plaintiffs' Post Trial Brief at 27; Defendants' Post Trial Brief at 5. Accordingly the court will so order.

3.    Estoppel

The Posts contend in Count IX of their complaint that they have established a view easement over the corner of the Gales' property that lies between their residence and the lake under the doctrine of equitable estoppel.

In *Littlefield v. Adler*, 676 A.2d 940, 942 (Me. 1996), the Law Court set forth the elements of equitable estoppel in a property dispute context as follows:

> Equitable estoppel precludes an owner from asserting his legal title when, by his own action or inaction, he has caused another person to act or alter her position to her detriment. Intent to mislead is not required, and mere silence can be sufficient to support the application of equitable estoppel if the owner's silence in fact misled the other party and the owner was silent when he had a duty to speak (for example, when inquiries are directed at him). Equitable estoppel based on an owner's silence will only be applied when it is shown by "clear and satisfactory" proof that the owner was silent when he had a duty to speak. "Clear and satisfactory proof" means clear and convincing proof. Equitable estoppel should be "carefully and sparingly applied."

(citations omitted).

The Posts have established by clear and convincing evidence here that they showed the Gales the design and orientation of their proposed residence and the

13

amount of window space facing southwesterly to obtain views of the lake and the maximum amount of sunlight and that the Posts inquired whether the Gales had any reactions or suggestions. Whether or not the Gales had any intent to mislead the Posts at that time, the Posts have established by clear and convincing evidence that the Posts relied to their detriment on the Gales' silence in response to these inquiries and went forward with the construction of a house that is oriented to the southwest and whose views and major light source are now squarely blocked by the Gales' fence.

Even though all of the elements of equitable estoppel are therefore met in this case, counsel for the Gales argues that there is no precedent for establishing a view easement by estoppel and that view easements in Maine can only be established by grant. *See Whitmore v. Brown*, 102 Me. at 59, 65 A. at 521 (Maine law "does not recognize any legal right to an unobstructed view of scenery over and across the lands . . . . of others unless acquired by grant"). *Whitmore*, however, did not involve a case of estoppel. While the court believes that the creation of new easements by estoppel should be restricted to very limited situations, if any case qualifies for relief on such grounds, this is the case. If some further limiting principle is necessary, that circumstance is present here given that the evidence demonstrates that the Gales, having enticed the Posts to proceed with their design both by silence and by affirmative encouragement, also had no plausible justification for erecting their fence other than to interfere with the Posts' enjoyment of their property.

The court concludes that the Posts are entitled to relief on their claim of estoppel.

4.      The Posts' Remaining Claims

Counts IV, V, and VI of the Posts' second amended complaint seek injunctive relief, abatement, and declaratory relief respectively. To the extent that the Posts are

14

entitled to such relief, the court has already awarded it under Counts III and IX as discussed above. Accordingly, no additional relief is available on these counts.

Count VII seeks prescriptive easements with respect to (1) the view discussed above with respect to Count IX, (2) the storage of a swimming float on the Gales' property, and (3) the location of the Posts' septic field. Although it has upheld the Posts' estoppel claim, the court does not conclude that a view easement would alternatively be available by virtue of a prescriptive easement. Absent equitable estoppel, view easements can only be acquired by grant.

In addition, since the location of the septic system is no longer at issue, the court need not consider the Posts' claim of prescriptive easement with respect to the septic system. On the issue of the float, the court concludes that the Posts have not established any prescriptive easement claim because it is at least as likely on this record that the storage of the Posts' float on the Gales' property was permissive.

Finally, the Posts do not appear to be pursuing Count VIII of their complaint (acquiescence), and the court finds no basis to award them relief on that theory.

5.    The Gales' Trespass Claim

That brings the court to the Gales' counterclaims. At this point, as noted above, the Gales are pursuing only one of their counterclaims – a statutory claim of trespass under 14 M.R.S. § 7751-B for Gail Post's temporary removal of the fluorescent fence and the No Dumping sign and for the temporary placement of litter on the defendants' property during construction. With respect to the placement of litter, defendants' trespass claim is addressed to the wrong parties. There was no evidence that the Posts themselves placed construction litter on the Gales' premises, instructed anyone else to do so, or supervised any contractor who may have done so. *See Bonk v. McPherson*, 605

15

A.2d 74, 79 (Me. 1992). To the extent that any litter may have been placed on the property during construction, the evidence was that this was a transitory problem, that the contractors removed any visible litter, and that there has been no damage to the property or the undergrowth caused thereby.

There was proof that shortly before Memorial Day 2006 Gail Post entered onto the Gales' property, untied the fluorescent snow fence and took down the No Dumping sign. There was no damage to the fencing or the sign, which were given back to the Gales upon request. The court finds that, although Gail Post was perplexed by the placement of a snow fence at that time of year, she did intentionally enter on property that she knew belonged to the Gales in order to take down the fence. There may be a question as to whether simply untying a fence constitutes "throwing down" a fence within the meaning of 14 M.R.S. § 7551-B(1)(A), but the court interprets Gail Post's actions as coming within the statute. Because no damage was caused, intentionally or otherwise, the double damage provision in § 7551-B(2) is not applicable.

Defendants are seeking nominal damages for this statutory violation, and where the statute speaks only of "actual damages," *see* §§ 7551-B(2), 7551-B(3)(A), there is a serious question whether nominal damages are available. Assuming nominal damages are available, the court awards nominal damages of $1.

Under the statute, defendants are also entitled to reasonable attorneys fees for preparing and bringing the claim. 14 M.R.S. § 7551-B(3)(C). Once again, there is a question whether, if no actual damages are recovered, the defendants are entitled to attorneys' fees under the statute. In looking at the wording of the statute, however, the court finds no indication that an award of attorneys' fees is contingent upon an award of actual damages or proof of actual damages.

16

However, this does not mean that defendants are entitled to all of their attorneys fees incurred in defending the Posts' claims and in pursuing their own. In the court's view, the Gales' right to attorney's fees would be limited to an award for the time spent drafting Count III of their counterclaim and litigating the issue of Gail Post's trespass. The court recalls that counsel for the defendants spent not more than 10 minutes questioning Mrs. Post on that subject and would therefore be surprised if attorneys' fees for more than one or two hours time in total would be warranted on this issue but will await defendants' fee application before making any final decision.[9]

The entry shall be:

1. On Count III of plaintiffs' second amended complaint, the court enters injunctive relief directing defendants to remove the fence that is presently located on their land along the boundary of the Posts' land that lies northwest of defendants' garage and ordering them not to erect any similar fence.

2. Although plaintiffs would also be entitled to relief under Count I of the second amended complaint in the form of an injunction directing defendants to lower those portions of the existing fence which still slightly exceed six feet, that relief is unnecessary in light of the broader relief offered under Count III.

---

[9] The Posts also seek attorney's fees in this action. The court would consider awarding punitive damages to the Posts in an amount that would approximate their attorneys fees, based on the actual malice shown by the Gales. However, punitive damages cannot be awarded in the absence of actual damages, see *Zemero Corp. v. Hall*, 2003 ME 111 ¶ 11, 831 A.2d 413, 416, and no actual damages have been awarded in this case. The Posts are not entitled to attorney's fees under the exception to the "American Rule" for egregious conduct because the court interprets that exception as applicable not to egregious conduct generally but to egregious abuse of the litigation process. *See Linscott v. Foy*, 1998 ME 206 ¶ 16, 716 A.2d 1017, 1021. However egregious the Gales' conduct might have been, they have not abused the litigation process. While the court has ruled against them on the facts, they have raised legal defenses that are not frivolous – e.g, as to the remedies available under the spite fence statute, as to whether common law nuisance provides a remedy for aesthetic injury, and as to whether view easements can be obtained by estoppel.

17

3. On Count IX of plaintiffs' second amended complaint (estoppel) the court enters a declaratory judgment that plaintiffs have by estoppel acquired the right to a view of the lake unobstructed by any fence or other structure over that portion of the defendants' land that lies to the west of their garage, beginning where there is an existing paved basketball court on the Posts' property.

4. Any party wishing to submit a further judgment setting forth the relief in Count IX in more detail (e.g., in a form that can be recorded) shall have 30 days in which to prepare and submit such a proposed judgment. The opposing party shall then have 10 days in which to file any objections.

5. Judgment is entered dismissing Count II of plaintiffs' complaint.

6. On Counts IV-VI of plaintiffs' second amended complaint, the court has already awarded all appropriate relief in paragraphs 1 and 3 above.

7. To the extent that plaintiffs are seeking a prescriptive easement with respect to their septic system, the court understands there is no longer a case in controversy on that issue. In all other respects, judgment is entered for defendants on Count VII and VIII of the second amended complaint.

8. On Count III of defendants' counterclaim (Counts I and II of the counterclaim having been withdrawn), the court enters judgment for defendants and against plaintiff Gail Post for nominal damages in the amount of $1.

9. On their application for attorneys fees pursuant to 14 M.R.S. § 7551-B(3)(C), defendants shall within 30 days submit a fee application detailing the rate they are seeking and the amount of time spent by counsel in pursuing their claim that Gail Post violated 14 M.R.S. § 7551(B)(1) by entering on the Gales' property and removing the snow fence and sign just before Memorial Day 2006. Plaintiffs

18

shall have 21 days in which to file any opposition to that application and defendants shall then have seven days to reply.

10. Costs shall be awarded to plaintiffs.


The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:    April __11__, 2008

_____
Thomas D. Warren
Justice, Superior Court



**STATE OF MAINE**
CUMBERLAND COUNTY SUPERIOR COURT

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

ROBERT PIAMPIANO ESQ
45 FOREST FALLS DRIVE SUITE B4
YARMOUTH ME 04096





**STATE OF MAINE**
CUMBERLAND COUNTY SUPERIOR COURT

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

CLIFFORD GOODALL ESQ
61 WINTHROP STREET
AUGUSTA ME 04330

